

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-15-00411-CR

---

BRYANT LEVINE                                                    APPELLANT

V.

THE STATE OF TEXAS                                                    STATE

----------

FROM THE 213TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 1355299D

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

A jury found Appellant Bryant Levine guilty of two counts of indecency with a child by contact, and the trial court sentenced him to six years' imprisonment on each count and ordered the sentences to run concurrently. In two points, Levine argues that the evidence is insufficient to sustain his convictions and that

---

[1]*See* Tex. R. App. P. 47.4.

the trial court abused its discretion by admitting, over his objections, two photographs of a penis. Because the evidence is sufficient to sustain Levine's convictions and because the trial court did not abuse its discretion by admitting the two complained-of photographs, we will affirm.

## II. FACTUAL OVERVIEW[2]

Rachel[3] was sixteen years old when her stepfather Levine touched her genitals on top of her clothes on two separate occasions. Around that same time, Levine showed Rachel nude photos of women, attempted to show her nude photos of himself, and sent Rachel text messages referencing sexual touching that he had already performed on her and requesting to sexually touch her again.

Mother found the text messages from Levine on Rachel's phone and asked Rachel about them; Rachel immediately started crying and told Mother that Levine had touched her inappropriately. When Mother confronted Levine, he initially denied any inappropriate touching but ultimately broke down in tears, confessed that he had inappropriately touched Rachel, and said he was sorry.

---

[2]We provide a more detailed recitation of the facts in connection with the analysis of Levine's sufficiency point.

[3]We use aliases to refer to the victim, her family members—other than Levine—and any other person necessary to protect the victim's identity. *See* 2d Tex. App. (Fort Worth) Loc. R. 7; *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982); *see also* Tex. R. App. P. 9.8(a), 9.10.

2

### III. SUFFICIENCY OF THE EVIDENCE

In his first issue, Levine argues that the evidence is insufficient to support his convictions for indecency with a child by contact. Levine argues that there is no evidence to show that he acted with the specific intent to arouse or gratify his sexual desire when he touched Rachel.

### A. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins*, 493 S.W.3d at 599.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based upon the

3

cumulative force of the evidence when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Id.* at 448–49; *see Blea*, 483 S.W.3d at 33.

## B. Elements of the Offense

A person commits the offense of indecency with a child by contact if, with a child younger than seventeen years of age and not the person's spouse, the person engages in sexual contact with the child. Tex. Penal Code Ann. § 21.11(a)(1) (West 2011). "Sexual contact" means the following acts, if committed with the intent to arouse or gratify the sexual desire of any person: any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child. *Id.* § 21.11(c)(1). A person acts intentionally with respect to the nature of the conduct or a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a) (West 2011). In the context of indecency with a child, the factfinder can infer the requisite intent to arouse or gratify the sexual desire from conduct, remarks, or all the surrounding circumstances. *See McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. [Panel Op.] 1981). The intent to arouse or gratify may be inferred from conduct alone. *Id.* No oral expression of intent or visible evidence of sexual arousal is necessary. *Gregory v. State*, 56 S.W.3d

4

164, 171 (Tex. App.—Houston [14th Dist.] 2001, pet. dism'd), *cert. denied*, 538 U.S. 978 (2003).

## C. The Evidence

### 1. Rachel's Testimony and Evidence of Text Messages

Rachel, who was a senior in high school at the time of the trial, testified that Levine's relationship with her changed from 2012 leading up until November 2013; the relationship went from being a friendly relationship to being "I like you, I want to be with you type of relationship." Rachel said that made her feel nasty and disgusting because she did not have romantic feelings for Levine.

Rachel described an inappropriate touching that occurred after school on or about November 1, 2013, when Levine was giving her a ride to her job. Rachel testified that she had her backpack in her lap and that Levine told her to put it on the floor. When she refused, Levine put Rachel's backpack on the floorboard and told her, "Open your legs." Rachel said no. Levine repeated his command and then pushed Rachel's legs apart, used his finger to press on her "private" on top of her clothes, and told her not to "let any man's penis go in there." Levine also told Rachel not to let any man's penis go in her mouth. Rachel told Levine that she did not like what he did.

Rachel testified that Levine texted her on November 5, 2013, and asked why she was wearing tights more often. Rachel thought his text was unusual because Levine did not typically concern himself with what she wore and because she had worn tights only twice.

5

Rachel testified that Levine approached her more than once after the November 1 event and offered her $500 to watch him masturbate and to let him watch her touch herself. Rachel told Levine "no."

Rachel described a second inappropriate touching that occurred on or about November 18, 2013. Rachel testified that when Levine picked her up after school, she got in the car and told him that she had marijuana in her purse because she had agreed to hold the marijuana for a friend so that the friend would not get in trouble. Levine acted like it was not a big deal that she had marijuana and told her that he "could flip it easy" because he knew other drug dealers. When they got home, Levine asked Rachel to come to the bedroom he shared with Mother. When Rachel came into the bedroom, Levine positioned Rachel with her butt facing a mirror, told her that this is how "they're going to do you in prison," and squeezed her butt. Levine also cupped his hand and moved it along her private part in the front, which made Rachel feel "nasty and disgusting." Rachel froze up and backed away. Rachel did not tell Mother because she did not want to hurt her.

Rachel testified that around 8:00 p.m. that same day, Levine sent her a text message that said, "I want you in that position again," followed by "BENEFITS" in all caps and a smiley face. Rachel responded, "Well, sir, I don't. I didn't like it." Levine responded with a frowny face. Rachel replied, "I really didn't. Cause I'm not attracted to you in that way. So [] it didn't feel good to me or anything." Levine said, "So." Rachel responded that she did not want to be in

that position anymore. Levine replied, "So I made my point." Rachel responded, "Yes," and Levine texted that her "p---y felt phat."[4]

Also during November 2013, on a day when Rachel was riding home from school with Levine, he told her that he had "other girls" and asked Rachel to connect him to a teenage girl who was not friends with Rachel. Levine then told Rachel to "look at this"; when Rachel looked, Levine showed her two photographs on his phone of a girl's private parts. Rachel responded that the photograph was nasty and turned her attention back to her own phone. Rachel mentioned that there was a guy whom she liked, and Levine responded, "I bet my d--k is bigger than his." Levine then attempted to show Rachel the photographs of his penis that were on his phone, but she would not turn her head to look at them.

During Rachel's testimony, the State admitted exhibits showing additional text messages from Levine to Rachel that included the following:

- On October 20, 2013, Rachel asked to borrow Levine's phone so that she could fix her Instagram account and asked for some batteries to put in the remote to her sister's television. Levine replied that Rachel could borrow his phone; asked if the batteries were for a vibrator; and told her that if she went through the picture gallery on his phone, "be a big girl and handle what[]ever u c ok?!" Rachel responded that she would not go through his

[4]Rachel agreed that the term "phat" is used to describe something that is good sexually.

photos because that was wrong and that she only needed his phone to fix her Instagram account.

- On November 7, 2013, Levine texted Rachel, "All these favors :) I want a booty grab." Rachel responded, "No."

- On November 20, 2013, Levine texted Rachel, "Ass look good."

## 2. Mother's Testimony

Mother testified that Levine is the father of three of her four children; Levine is Rachel's stepfather. Levine was not Rachel's disciplinarian; he was a person Rachel could talk to if she did not feel comfortable talking to Mother.

Mother periodically checked Rachel's phone, and on November 24, 2013, she found text messages between Levine and Rachel. Mother asked Rachel about the text messages, and she immediately started crying and told Mother that Levine had touched her inappropriately. Mother then confronted Levine, who denied the inappropriate touching and said that Rachel was lying. Mother called Rachel into the room and asked her to repeat what she had told Mother. Levine again denied the accusations until Rachel added that he had offered her $500 to rub her vagina and to watch him "jack off"; at that point, he started crying and saying he was sorry. Levine explained that he had touched Rachel "in that manner" because Rachel had some marijuana in her possession and he wanted to show her what she would endure if she went to prison. Mother told Levine to leave, and after asking to stay because Rachel was only two years away from leaving for college, he eventually left that same evening.

8

Mother reported the incident to the police and consented to allowing the police to search Rachel's phone for the text messages from Levine. Levine later gave his son his old cell phone, and Mother turned it over to the police.

### 3. Detective Duc Nguyen

Detective Duc Nguyen, a computer examiner with the Fort Worth Police Department, testified that he had examined the data on a Samsung Galaxy S2 cell phone and had found that the user name was Bryant Levine. The earliest text messages on the phone were from November 25, 2013, which was after Levine gave the phone to his son.[5] Detective Nguyen testified that he included in his report ninety-six photos from the phone, including State's Exhibits 7 and 8 (photos of female genitalia) and State's Exhibits 16 and 17 (penis photos).

### 4. Levine

Levine testified about the day when Rachel told him that she had marijuana in her backpack. He said that he immediately became upset and was mortified because he could have been questioned about the marijuana if he had been stopped by the police. Levine said that he snatched the marijuana; grabbed Rachel between the legs; and said, "This is what they will do to you in the penitentiary." Levine testified, "I'm not saying it was the right thing to do. But I was trying to make a point because she was [an Advanced Placement]

---

[5]Levine testified that he had taken his white Samsung cell phone to have it "wiped clean" of all text messages and photographs before he gave it to his son. Levine testified that he did not know that it still had photographs on it when he gave it to his son.

9

student." Levine testified that he did not grab Rachel to arouse or gratify himself sexually; it was discipline. Levine explained,

> And I'm not bragging or anything[,] and I'm not saying that it's right[] because I was with . . . her mother. But I was a whore. I did a lot of whorish things[,] and I had a lot of whorish ways. And I was with a lot of women, as -- as the cell phone depicted. And -- but I'm a grown man[;] I can have a lot of women in my phone.

Levine testified that after they got home, he made Rachel follow him into the bedroom he shared with Mother, slammed the door, and told Rachel to give him the marijuana. Levine held the marijuana up high and told her that he was going to throw it into the toilet. Levine testified that Rachel jumped up against him and that he pushed her back. Levine told Rachel that he was not going to give the marijuana back to her, and Rachel said that she would tell Mother that he had touched her inappropriately. Levine dropped the marijuana and said, "It's not like you're mine anyway."

Levine testified that he never touched Rachel on November 1 in the manner she described. Levine also denied sending the text messages on November 18; he explained that he normally went to bed at 7:30 or 8:00 p.m. every day.

Levine testified that when he texted Rachel about wearing tights, he wanted to know why she was not wearing one of the thirteen pairs of pants that he had purchased for her. Levine explained that the "[a]ss look good" text was not a reference to Rachel's body but instead pertained to Rachel's best friend's mother, with whom Levine was allegedly flirting.

10

On cross-examination, Levine testified that he had "popped" Rachel on her vagina to discipline her. He said, "I have enough women to gratify myself. And I'm not proud of that. But my phone dictates that. I'm a 41-year-old man, 39-year-old man who can walk out of this building and -- and find a woman." Levine denied trying to show Rachel the photographs of his penis that were on his phone.

With regard to the November 18 text messages, Levine opined that Rachel had used his phone to send the messages to her phone. With regard to the text about a "booty grab," Levine testified that it pertained to Rachel's friend's mother. The State questioned Levine about other text messages he had sent Rachel in which he had admitted asking her to get him the phone numbers of certain classmates, whom he described as "little big booty girl, the one who's a player, and the one with the ass."

Levine testified that he did not tell Mother about the discipline he gave Rachel or the marijuana and that Mother had lied when she testified that he had admitted to her that he had touched Rachel inappropriately. Levine testified that he had confessed his inappropriate touching of Rachel to his son and daughter.

### 5. Testimony from Detective Michael McCormack

Detective Michael McCormack with the Fort Worth Police Department testified that he had watched Rachel's forensic interview from the monitoring room while it was being conducted, that he had observed the forensic interviews

11

with Rachel's two siblings, and that he had interviewed Levine.[6]  During the interview, Levine said that he did not touch Rachel.  Detective McCormack asked Levine about specific text messages that had been sent to Rachel's phone number from his phone number, and Levine said that he did not send them.  Detective McCormack testified that upon reviewing Rachel's text messages, he believed that Rachel was at the mall when the November 18, 2013 text messages were sent and that Levine was not with her.  Detective McCormack said that information—that Rachel was at the mall and that Levine was at another location when those messages were sent—also came up in the forensic interviews.  Detective McCormack testified that Levine groomed Rachel by sending her text messages and by telling her that she could share her secrets with him instead of with Mother.

Also during the interview, Levine brought up the marijuana incident.  Levine told Detective McCormack that the conversation with Rachel about the marijuana took place in two locations:  in the car and in his bedroom.  Detective McCormack asked Levine whether he had touched Rachel inappropriately, and he said, "I didn't touch her at all."  During the interview, which lasted more than an hour, Levine did not mention that he had touched Rachel to discipline her.

---

[6]The interview was recorded, but the video of the interview was not admitted into evidence or played for the jury.

## D. Sufficiency Analysis

As set forth above, Rachel described in detail the inappropriate touching that occurred on November 1, 2013, and the inappropriate touching that occurred on November 18, 2013. Rachel also testified about Levine's proposition to pay her to watch him masturbate, his attempts to show her nude photos, and the numerous text messages that he had sent her during October and November 2013. Mother testified that when she confronted Levine about touching Rachel, he initially denied any touching until Rachel mentioned the masturbation proposition; at that point, he started crying and apologizing for touching Rachel "in that manner." Levine did not deny touching Rachel's genitals during the marijuana incident; instead, he insisted that the inappropriate touching constituted Rachel's discipline for possessing marijuana. Levine also told the jury that he was "whorish," that he had been with a lot of women, and that he could "walk out of the building and . . . find a woman."

Here, the jury was free to believe Rachel and to disbelieve Levine. The jury also could have inferred that Levine had the intent to arouse or gratify his sexual desire based on his conduct in touching Rachel's genitals over her clothes on two occasions; the sexual remarks he made in the text messages he had sent to Rachel; and the surrounding circumstances, which included grooming Rachel and showing her nude photographs. Accordingly, viewing all of the evidence— including the text messages sent from Levine's phone number to Rachel's phone number—and the reasonable inferences from it and deferring to the jury's weight

and credibility of the evidence determinations, we hold that a rational trier of fact could have found beyond a reasonable doubt that the essential elements of the offense of indecency with a child (Rachel) by contact were committed by Levine on or about November 1, 2013, and on or about November 18, 2013. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *McKenzie*, 617 S.W.2d at 216; *Jimenez v. State*, 507 S.W.3d 438, 443–44 (Tex. App.—Fort Worth 2016, no pet.) (holding that a rational trier of fact could have found beyond a reasonable doubt that the essential elements of the offense of indecency with a child by contact were committed by appellant). We overrule Levine's first point.

## IV. NO ABUSE OF DISCRETION BY ADMITTING COMPLAINED-OF PHOTOGRAPHS

In his second point, Levine argues that the trial court abused its discretion by overruling his relevancy objections to State's Exhibits 16 and 17, which were photographs depicting a penis. Specifically, Levine argues that the penis photographs make no issue in dispute more probable or less probable than it would be without the evidence.[7]

---

[7]To the extent Levine's second point argues that the trial court abused its discretion by overruling his objections to State's Exhibits 16 and 17 because he was not charged with sending pornographic pictures to Rachel and because there was no evidence of whose penis was in the photographs or who took the photographs, Levine's general relevancy objection at trial did not preserve an extraneous-offense complaint or a rule 901 authentication complaint. *See Jimenez v. State*, No. 05-13-01523-CR, 2014 WL 6678073, at *3 (Tex. App.—Dallas Nov. 25, 2014, no pet.) (mem. op., not designated for publication) (holding hearsay, relevance, and remoteness objections did not preserve for appellate review a complaint regarding improper authentication under rule 901); *cf. Muniz-*

We review a trial court's decision to admit evidence under an abuse-of-discretion standard. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); *Lagrone v. State*, 942 S.W.2d 602, 613 (Tex. Crim. App.), *cert. denied*, 522 U.S. 917 (1997). As long as the trial court's ruling falls within the zone of reasonable disagreement, we will affirm the trial court's decision. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010), *cert. denied*, 563 U.S. 1037 (2011); *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Tex. R. Evid. 401. Generally, a photograph is admissible if verbal testimony as to matters depicted in the photograph is admissible. *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007), *cert. denied*, 553 U.S. 1080 (2008). In other words, if verbal testimony is relevant, photographs of the same are also relevant. *Id.*

As set forth above, Rachel testified that when she told Levine that there was a guy whom she liked, he responded, "I bet my d--k is bigger than his," and

*Luna v. State*, No. 03-09-00266-CR, 2010 WL 3810820, at *5 (Tex. App.—Austin Sept. 30, 2010, pet. ref'd) (mem. op., not designated for publication) (holding that appellant failed to preserve request for limiting instruction when evidence was admissible under article 38.37 and counsel had only objected and requested instruction under rule 404(b)); *Batiste v. State*, 217 S.W.3d 74, 82 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (holding that trial objection on relevancy grounds did not preserve rule 404(b) extraneous offense complaint for appellate review). *See generally* Tex. R. Evid. 404(b), 901(b)(1).

15

attempted to show Rachel photographs of his penis on his phone. During Levine's testimony, he denied trying to show Rachel the photographs of his penis that were on his phone. Because the photographs were relevant to corroborate Rachel's admissible testimony about Levine's attempt to show her pictures of his penis and because the photographs were also relevant evidence from which the jury could infer that Levine's intent when he touched Rachel was to arouse or gratify his sexual desire—an element of the offense that the State was required to prove, we hold that the trial court did not abuse its discretion by overruling Levine's relevancy objections to State's Exhibits 16 and 17. *See* Tex. R. Evid. 401; *Gallo*, 239 S.W.3d at 762; *Young v. State*, 242 S.W.3d 192, 200–01 (Tex. App.—Tyler 2007, no pet.) (holding photographs of magazine that depicted young girls going wild on spring break, when considered in conjunction with victim's testimony that appellant took picture of her with her vagina exhibited, was relevant because it tended to make more probable that appellant's intent was that victim's exhibition of her vagina be of a lewd fashion); *see also Perry v. State*, Nos. 05-07-01174-CR, 05-07-01313-CR, 2008 WL 2600681, at *2 (Tex. App.—Dallas July 2, 2008, no pet.) (mem. op., not designated for publication) (holding internet advertisement for teen pornography site and photograph of young women in cheerleader costumes in sexually suggestive poses were both relevant to corroborate complainant's testimony that appellant had showed her "pictures of kids that he molested").[8] We overrule Levine's second point.

_____

[8]Although Levine includes a statement in the law section of his brief on rule

16

## V. CONCLUSION

Having overruled Levine's two points, we affirm the trial court's judgments.


PER CURIAM

PANEL:  WALKER, MEIER, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  April 20, 2017

---

403, he did not make a rule 403 objection at trial and does not argue on appeal that the penis photographs are more prejudicial than probative.  Because Levine's general relevance objection at trial did not preserve any appellate argument based on rule 403 and because his brief does not contain a rule 403 analysis, we need not analyze whether the penis photos should have been excluded under rule 403.  *See Sony v. State*, 307 S.W.3d 348, 355–56 (Tex. App.—San Antonio 2009, no pet.) (holding that because appellant raised only a rule 401 complaint with regard to the photographs, he had waived his rule 403 complaint).